1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3                _____

4    GABRIEL MARTINEZ, and Donal Childers   )
     on behalf of Cruz Baca Soto,           )
5                                           )
                          Plaintiffs,       )   CV 11-00961-PHX-DGC
6                                           )
           vs.                              )   Phoenix, Arizona
7                                           )   January 15, 2013
     UPS Ground Freight, Inc., and          )
8    Alfredo Duenas,                        )
                                            )
9                          Defendants.      )
     _____)

10

11

12

13

14        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

15        REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

16                      TRIAL DAY 1

17    (TESTIMONY OF DETECTIVE SCHWARTZ AND DETECTIVE SOLACE)

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3    For the Plaintiff:

4            Alex & Gaxiola
             By: **ANDREW R. ALEX,** ESQ.
5            1717 E. Bell Rd., Ste 1
             Phoenix, AZ  85022
6

7

8    For the Defendants:

9            Ansa Assuncoa, LLP
             By: **MICHAEL J. O'NEILL,** ESQ.
10           4 Penn Center
             1600 John F. Kennedy Blvd., Ste 900
11           Philadelphia, PA  19103

12

13           Jones Skelton & Hochuli, PLC
             By: **PHILLIP H. STANFIELD,** ESQ.
14           2901 N. Central Ave., Ste 800
             Phoenix, AZ  85004
15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2                            <u>**EXAMINATION**</u>

3    <u>**WITNESS**</u>                                              <u>**PAGE**</u>

4    DETECTIVE MICHAEL SOLACE

5            Direct Examination By Mr. Alex              5

6            Cross-Examination By Mr. O'Neill           25

7    DETECTIVE DAVID SCHWARTZ

8            Direct Examination By Mr. Alex             29

9            Cross-Examination By Mr. O'Neill           38

10           Redirect Examination By Mr. Alex           44

11                             <u>**EXHIBITS**</u>

12   <u>**NUMBER**</u>    <u>**DESCRIPTION**</u>                            <u>**PAGE**</u>

13   1         Diagram of Accident Scene              10
               (enlarged)
14
     2         Arizona Crash Report                   10
15
     3         Phoenix Police Department              10
16             Report and Supplemental
               Reports 1 through 15
17
     4         Phoenix Police Department              10
18             Driver's License Verification
               on Alfredo Duenas and Wilmer
19             Maldanado; Vehicle
               Registration Verification
20             related to Defendants'
               Freightliner Tractor; Vehicle
21             Weight Record Report;
               Driver/Vehicle Examination
22             Report with Inspection Report
               of Ofc. Richard Simonick
23             #3809

24   18        Photograph of both vehicles            22
               at collision resting site at
25             accident scene, taken by
               Phoenix Police Department

**(Index of Exhibits Continued)**

**EXHIBITS**

| **NUMBER** | **DESCRIPTION** | **PAGE** |
|---|---|---|
| 19 | Photograph (1) of extrication showing both vehicles at collision resting site at accident scene, taken by Phoenix Police Department | 22 |
| 20 | Photograph (1) of Freightliner front end damage at accident scene, taken by Phoenix Police Department | 22 |
| 35 | Photographs of the subject Freightliner tractor with the UPS freight placard depicted on driver's door | 22 |

DIRECT EXAMINATION - DETECTIVE MICHAEL SOLACE

**P R O C E E D I N G S**

1

2          (The following partial transcript is the trial

3    testimony of Detective Solace and Detective Schwartz.)

4

14:30:26  5          THE COURT:  Mr. Alex, your first witness, please.

6          MR. ALEX:  Yes.  It would be Mike Solace, Detective

7    Solace.  He's in the witness room; may I get him?

8          THE COURT:  You can get him, that's fine.

9          Ladies and gentlemen, if you want to stand up for a

14:30:42  10   minute while he's getting him to stretch, feel free to do

11   that.

12                 **DETECTIVE MICHAEL SOLACE,**

13   called as a witness herein, after having been first duly sworn

14   or affirmed, was examined and testified as follows:

14:31:30  15            D I R E C T   E X A M I N A T I O N

16   BY MR. ALEX:

17   Q   Good afternoon.  How are you doing?

18   A   Very well, thank you.

19   Q   Could I ask you to state your full name, please.

14:32:23  20   A   My name is Michael Solace.

21          THE COURT:  Sir -- excuse me, sir.  Can you get about

22   this close to the mike.  It can slide forward if you need it

23   to, but if you speak right into it we'll be able to hear you

24   better.

14:32:34  25   A   My name is Mike Solace.

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:32:36  1    Q    What is your occupation?

2    A    I'm currently assigned as detective for the Phoenix Police

3    Department.

4    Q    How long have you been with the Phoenix Police Department?

14:32:43  5    A    22 years.

6    Q    Can you tell us a little bit about your employment history

7    with the department.

8    A    When I came on I did general patrol in two of our southern

9    precincts.  In 1999 I transferred to a motor position

14:32:59  10   investigating collisions, both fender benders and serious

11   injury.  Then in 2006 I transferred to the vehicular crimes

12   unit where I've been since.

13   Q    And what is the vehicular crimes unit?

14   A    We investigate all serious and fatal traffic collisions in

14:33:21  15   the City of Phoenix.  All the detectives there are not only

16   trained investigators but we're actually reconstructionists.

17            THE COURT:  Excuse me for a minute, Mr. Alex.

18            Can the jury hear Detective Solace very well?  I

19   think we need to check that mike and see how well it's

14:33:36  20   working.

21            (Microphone issue was resolved.)

22            THE WITNESS:  Can everybody hear me now?

23            THE COURT:  Much better.

24            All right.  Thanks, Mr. Alex, you can continue.

25

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:35:34   1   BY MR. ALEX:

2   Q   How long have you been -- you've been investigating

3   serious accidents, then, for some time, correct?

4   A   Yes, since 2006.

14:35:45   5   Q   2006.  And approximately how many cases have you

6   investigated?

7   A   In my time in vehicular crimes, close to 400.

8   Q   All right.  And my understanding in this case, you're the

9   case agent?

14:35:58   10   A   That is correct.

11   Q   What is a case agent?

12   A   The case agent in these situations does witness

13   interviews, driver interviews, contacts next of kin, creates

14   the collision report.  If it was going to go anywhere for

14:36:17   15   charging and stuff we'd be liaison between the charging

16   agency, county or city, getting all that paperwork filed.

17   Q   Are you the person who's most responsible for the overall

18   investigation of the case?

19   A   As far as putting it together and culminating it, yes.

14:36:34   20   Q   How did you learn of this particular accident that

21   occurred on April 5th, 2009?

22   A   My sergeant called me at home and advised me.

23   Q   All right.  As you know, the accident was at 51st Avenue

24   and West Van Buren.  Did you go there?

14:36:48   25   A   Yes, I did.

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:36:50  1   Q   And just approximately what time did you arrive?

2   A   I arrived at a quarter after 4:00.

3   Q   All right.  And this accident was in Maricopa County?

4   A   Yes, it was.

14:37:00  5   Q   And did you learn that Marcela Baca and two other

6   individuals died in the accident and another person seriously

7   injured?

8   A   Yes.

9   Q   And the accident scene was secured; is that correct?

14:37:21  10   A   That's correct.

11   Q   Was that done before you arrived?

12   A   Yes, it was.

13   Q   All right.  The vehicles themselves were they still

14   present when you arrived?

14:37:29  15   A   Yes, they were.

16   Q   That was a 2003 Freightliner and 1994 white Cadillac?

17   A   That's correct.

18   Q   And it's my understanding that there were a number of

19   police officers and detectives at the scene.

14:37:45  20   A   There were numerous patrol officers that arrived shortly

21   after the collision occurred and secured the scene.  As far as

22   detectives, there were four of us -- five of us, make that,

23   and my supervisor.

24   Q   And as the investigation continued, I think witness

14:38:07  25   statements were taken, correct?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:38:09  1    A    That's correct.

2    Q    A diagram of the scene was completed --

3    A    That's correct.

4    Q    -- is that correct?

14:38:15  5         And eventually a police report was issued.

6    A    That is correct.

7    Q    And the police report is the titled the Arizona Crash

8    Report which is 2009-90549358?

9    A    That's correct.  That's the state form done for any

14:38:36  10   collision investigated by a police department in the state of

11   Arizona.

12   Q    And there was also a City of Phoenix Police Departmental

13   report?

14   A    That is correct.

14:38:45  15   Q    And I will tell you it has the same number.  And there's

16   also a vehicle inspection report.

17   A    That's correct.

18   Q    And those things combined is what you call your

19   accident -- City of Phoenix accident report; is that correct?

14:39:01  20   A    That is correct.

21        MR. ALEX:  And it's my understanding, Your Honor,

22   Exhibits Number 1, 2, 3, and 4 are admitted in evidence.

23        THE COURT:  I haven't admitted any so you'll need to

24   move them into evidence.  If the parties have agreed, there

14:39:16  25   will be no objection.  But let's do it an exhibit at a time so

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:39:20  1    there's a clear record of what comes in.  So you're moving 1

2    through 4, is that right, Mr. Alex?

3            MR. ALEX:  It's my understanding that was going to be

4    done by stipulation.

14:39:29  5            THE COURT:  Okay, but you still need to move them

6    into evidence.

7            Is there any objection to Exhibits 1 through 4?

8            MR. O'NEILL:  Your Honor, if Exhibits 1 through 4 are

9    just the police report with supplements, then there are no

14:39:38  10   objections.

11            MR. ALEX:  And the --

12            THE COURT:  We can't hear you, Mr. Alex.

13            MR. ALEX:  And the accident diagram.

14            MR. O'NEILL:  No objection, subject to our

14:39:49  15   conversation earlier, Your Honor, about redactions.

16            THE COURT:  All right.  Exhibits 1 through 4 will be

17   admitted.

18            (Exhibits 1 through 4 admitted.)

19            MR. ALEX:  May I --

14:40:00  20            THE COURTROOM DEPUTY:  He has exhibits before him.

21            MR. ALEX:  Okay.  I want to look at the diagram.  May

22   I?

23            THE COURT:  Mr. O'Neill, Mr. Stanfield, if you need

24   to walk over here to see what's being referred to, feel free

14:40:47  25   to do that when he's referring to the chart.

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:40:50  1        MR. O'NEILL:  Yes, sir.

2        MR. ALEX:  Your Honor, may I approach the chart?

3        THE COURT:  Yeah, but you need speak up real loud so

4   everybody in the courtroom can hear you.

14:41:11  5   BY MR. ALEX:

6   Q    Detective Solace, can you see the chart from where you

7   are?

8   A    Yes, sir.

9   Q    And this is essentially a diagram that the City of Phoenix

14:41:19 10   Police Department made, correct?

11   A    Yes.

12   Q    All we've done is enlarge it, correct?

13   A    And there are some additions in the lane that were not in

14   our diagram.

14:41:28 15   Q    There's some markings that were taken out, but my question

16   is, is the depiction of the crash with the tractor-trailer and

17   white Cadillac, is that in the proper general location?

18   A    Yes, it is.

19   Q    And then the vehicles apparently went southwest, is that

14:41:52 20   correct, after the point of impact?

21   A    Yes, it is.

22   Q    And there's some red marks and some blue marks that show

23   the general path of the two vehicles; is that correct?

24   A    Yes.

14:42:05 25   Q    I believe a traffic control light was taken out?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:42:10  1   A    That's correct.  It was taken out, which put all the rest

2   of the lights out at the intersection.

3   Q    And the two vehicles went over the curb and I think

4   there's a chain link fence here, is that correct, for

14:42:20  5   commercial yard?

6   A    Yes.

7   Q    Then the vehicles came to rest where they're now showing

8   in the southwest corner, correct?

9   A    That is correct.

14:42:30  10   Q    And to your knowledge this -- it's been admitted, but this

11   is accurate and correctly depicts the general way the

12   collision occurred?

13   A    Yes.

14         THE COURT:  Would you refer to that by exhibit

14:42:42  15   number?

16         MR. ALEX:  Exhibit 1.

17         THE COURT:  Okay.  The chart is Exhibit 1?

18         MR. ALEX:  Yes, sir.

19         THE COURT:  Okay.

14:42:49  20   BY MR. ALEX:

21   Q    And Detective Solace, as I understand it, Mr. Duenas was

22   driving southbound on 51st Avenue?

23   A    That is correct.

24   Q    And that would be, then, in the curb lane; is that

14:43:00  25   correct?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:43:02  1   A    Yes, sir.

2   Q    And you understood and it's been stipulated the light was

3   red for Mr. Duenas, correct --

4   A    That's correct.

14:43:12  5   Q    -- when he entered into the intersection.

6        And the blue car, or Cadillac, was driving westbound

7   on West Van Buren?

8   A    That is correct.

9   Q    And the approximate place of impact, sometimes we call it

14:43:31  10  a T-bone, but it looks like the white Cadillac was broadsided

11  by the front of the tractor; is that correct?

12       MR. O'NEILL:  Your Honor, I'm going to object as to

13  leading.

14       THE COURT:  Sustained.

14:43:45  15  BY MR. ALEX:

16  Q    All right.  Does this Exhibit Number 1 show the area of

17  impact, to the best of your knowledge?

18  A    Yes, it does.

19  Q    And this is the way the vehicles came to rest?

14:44:02  20  A    That is correct.

21  Q    Now, as I understand it, various officers interviewed

22  witnesses, correct?

23  A    Yes.  Myself and Detective Orsted interviewed witnesses.

24  Q    All right.  And also Mr. Maldonado was interviewed by

14:44:50  25  you -- Mr. Duenas; is that correct?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:44:53  1   A    That is correct.

2   Q    And Detective Schwartz also interviewed Mr. Duenas; is

3   that correct?

4   A    Yes, he did.

14:45:09  5   Q    I would like you to -- can you tell us about your initial

6   interview --

7          THE COURT:  Please speak into the mike, if you would,

8   Mr. Alex.  We couldn't hear that.  Speak into the mike, if you

9   would.

14:45:22  10          You can speak into the stationary one, just when you

11   move around wait until you get back to the mike to speak.

12          MR. ALEX:  One moment, Your Honor.

13   BY MR. ALEX:

14   Q    The -- you were the -- you were the originating officer of

14:46:01  15   the police report; is that correct?

16   A    Yes.

17   Q    And it's Exhibit Number 3.

18   A    Yes, it is.

19   Q    Okay.  And can you turn to page 10.

14:46:30  20          Now, can you tell us where you interviewed

21   Mr. Duenas.

22   A    Mr. Duenas was waiting south of the scene on 51st Avenue

23   on the west side of the street with a patrol officer, along

24   with the passenger of the semi truck.

14:46:46  25   Q    And were you able to understand Mr. Duenas?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:46:50  1   A    Yes.

2   Q    And did you have any difficulty communicating with him?

3   A    Some.  We got the interview done, but he does have some

4   problems with English/Spanish translation.

14:47:05  5   Q    Did he seem to understand what -- your questions?

6   A    Yes, he did.

7   Q    Did you understand his responses?

8   A    Yes, I did.

9   Q    Okay.  Can you tell us what Mr. Duenas told you?

14:47:17  10   A    Yes.  He stated that they had arrived earlier in the

11   afternoon at approximately 1 o'clock at the UPS yard located

12   at 51st Avenue and Lower Buckeye.  They had dropped off their

13   load, which was the entire trailer, and then proceeded to head

14   back towards California.  He estimated that they had traveled

14:47:40  15   approximately 30 miles before realizing they had not turned in

16   the appropriate paperwork to UPS in order to get paid, so they

17   turned around on the freeway and were returning to that yard

18   in order to turn the paperwork in when the collision occurred.

19   Q    All right.  Did he tell you anything else?

14:47:59  20   A    He stated he was southbound on 51st Avenue.  He believed

21   that there was a car ahead of him slowing to make a right-hand

22   turn, and that once it cleared he proceeded through the

23   intersection on a green light and the collision occurred.

24   Q    Mr. Duenas told you when you interviewed him at the scene

14:48:17  25   that he went through green light not a red light; is that

DIRECT EXAMINATION - DETECTIVE MICHAEL SOLACE

14:48:21   1   correct?

2   A   That's correct.

3   Q   Did Mr. Duenas tell you anything else?

4   A   Go ahead.

14:48:33   5   Q   Did he indicate whether there were any vehicles

6   immediately to his left?

7   A   He didn't recall if there were any other vehicles stopped

8   or passing, either way, on his left-hand side.

9   Q   And did he tell you that as he entered the intersection

14:48:48  10   that he observed a white Cadillac out of the corner of his

11   eye?

12           MR. O'NEILL:  Objection, leading, Your Honor.

13           THE COURT:  Sustained.

14   BY MR. ALEX:

14:48:57  15   Q   Did he tell you anything about the white Cadillac.

16   A   Yes, he did.  He stated that he remembered seeing it out

17   of the corner of his eye.

18   Q   Stop there.  And once again did he tell you the color of

19   the light for him?

14:49:12  20   A   Yes; he stated it was green.

21   Q   Did that conclude your interview?

22   A   Yes, it did.

23   Q   I would like to show you Exhibit Numbers 17, 18, 19, 20

24   and 35.  I think they're there.

14:50:02  25   A   Yes.  17, 18, 19, 20 and 35?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:50:07  1    Q    Yes.

       2    A    All right.

       3    Q    They're there?

       4    A    Yes.

14:50:11  5    Q    Were these exhibits taken by the Phoenix Police

       6    Department?

       7    A    Yes, 17 was taken by the Phoenix Police Department.

       8           18 was taken by the Phoenix Police Department.

       9           19 was taken by the Phoenix Police Department.

14:50:48  10          20 was also taken by the Phoenix Police Department.

      11          And 35 was also taken by us, yes.

      12    Q    All right.  And do they accurately and correctly depict

      13    the scene?

      14          THE COURT:  We couldn't hear that question, Mr. Alex.

14:51:08  15    BY MR. ALEX:

      16    Q    Let me ask you, with respect to Exhibit Number 17 --

      17          MR. ALEX:  And with respect to Exhibit Number 17, I'm

      18    going to withdraw it, Your Honor.

      19          THE COURT:  What was the question?

14:51:22  20          MR. ALEX:  With respect to -- let me do it.

      21    BY MR. ALEX:

      22    Q    With respect to Exhibit Number 17, does that accurately

      23    and correctly depict what's described in the photograph?

      24    A    Yes.

14:51:36  25    Q    Okay.  With respect to Exhibit Number 18 --

DIRECT EXAMINATION - DETECTIVE MICHAEL SOLACE

14:51:48   1          (Counsel confer.)

       2          MR. ALEX:  Your Honor, it's my understanding there's

       3   a stipulation between counsel that Exhibits 18, 19 -- 18, 19,

       4   20, and 35, there's no objection to it.

14:52:04   5          THE COURT:  I think what Mr. O'Neill said is if you

       6   can lay a foundation there's no objection.  I think you need

       7   to lay the foundation for them.

       8          MR. O'NEILL:  And I could articulate -- I could

       9   articulate specifically my objection to -- I don't think the

14:52:21  10   foundation's been laid yet that this was the condition of the

      11   scene when he was there.

      12          THE COURT:  All right.  So there's an objection to

      13   the evidence.

      14          MR. ALEX:  Okay.

14:52:34  15   BY MR. ALEX:

      16   Q   The photographs that you've looked at, those were taken by

      17   the Phoenix Police Department?

      18   A   Yes, they were.

      19   Q   And by the way, the photographs were taken under your

14:52:46  20   direction and control?

      21   A   No.  Some of the photographs were taken once the

      22   detectives were on scene and we began our investigation by my

      23   supervisor at the time.  Some of the photographs were taken by

      24   first responding officers who took the photographs prior to my

14:53:01  25   arrival.

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:53:02  1   Q   All right.  But still under your case direction?  It's

2   part of the investigation.

3   A   Yes.

4           MR. O'NEILL:  Objection, leading, Your Honor.

14:53:14  5           THE COURT:  Overruled.

6   BY MR. ALEX:

7   Q   Were the photographs taken as part of the investigation of

8   the accident?

9   A   Yes, they were.

14:53:23 10   Q   All right.  And to your knowledge do they accurately and

11  correctly depict the scene as it occurred on the day of the

12  accident?

13  A   Yes.

14          MR. ALEX:  At this time I would move to admit number

14:53:40 15  18, 19, 20, and 35.

16          MR. O'NEILL:  I'm still going --

17          THE COURT:  You need to stand if there's an

18  objection.

19          MR. O'NEILL:  Apologize, Your Honor.

14:53:48 20          I'm still going to object, Your Honor.  I don't think

21  the foundation's been laid these photographs accurately depict

22  the condition of the scene when the officer arrived or whether

23  he ever saw the scene in this condition.

24          THE COURT:  I think you need to clarify that,

14:54:00 25  Mr. Alex.

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:54:02  1        MR. ALEX:  Okay.

2    BY MR. ALEX:

3    Q    When you arrived, did the scene look like it does in

4    Exhibit Number 1?

14:54:08  5    A    Yes, it did.

6    Q    So nothing had changed; is that correct?

7    A    As far as looking at the pictures, the only thing that

8    changed from the collision to when I arrived, the Cadillac had

9    the top cut off and was removed when I arrived at the scene,

14:54:28  10   which obviously wasn't the case when it was involved in the

11   collision.

12   Q    All right.  So some early responders arrived to extricate

13   the witnesses; is that correct?

14   A    The fire department, yes.

14:54:40  15   Q    Other than that, the photographs depict the scene as when

16   you were there, correct?

17   A    Yes.

18   Q    All right.  And also, all the photographs were by the

19   Phoenix Police Department and all of these are part of the

14:54:59  20   public records; is that correct?

21   A    That is correct.

22        MR. ALEX:  I could lay the foundation for public

23   records if you want --

24        THE COURT:  I don't think it's a hearsay objection.

14:55:15  25        So are you again moving their admission?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:55:17  1          MR. ALEX:  That's correct.

       2          MR. O'NEILL:  I still don't think the proper

       3     foundation's been laid through this witness for the

       4     introduction of these photographs, Your Honor.

14:55:26  5          THE COURT:  Why?

       6          MR. O'NEILL:  The officer -- detective, I should say,

       7     sorry, has conceded that the conditions of the vehicle, the

       8     Cadillac, in the photographs that are depicted is not similar

       9     or even remotely close to what he saw at the time of his

14:55:41 10     arrival.

      11          THE COURT:  Well, let's do it one exhibit at a time,

      12     then, if we need to.

      13          Mr. Alex, I think you need to go exhibit by exhibit

      14     and ask the detective if what's depicted in the exhibit is

14:55:54 15     what he can say was existing at the time.

      16     BY MR. ALEX:

      17     Q    Would you go to Exhibit Number 18.

      18          Does Exhibit Number 18 depict the way the vehicles

      19     came to rest?

14:56:17 20     A    Yes, it does.

      21     Q    Okay.  Is there anything about Exhibit Number 18 that is

      22     substantially different than when you arrived?

      23     A    No.

      24     Q    Let's go to number 19.  Number 19 shows two vehicles

14:56:48 25     coming to rest, correct?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:56:50   1    A    That is correct.

2    Q    And in this instance there's first responders attempting

3    to extricate the victims.

4    A    Yes.

14:57:00   5    Q    Number 20, can you tell us what that depicts.

6             MR. O'NEILL:  Your Honor, I withdraw my objections.

7    Now looking at these again, I withdraw my objections.

8             THE COURT:  All right.  Exhibits 17, 18, 19, 20, and

9    35 are admitted.

14:57:29  10             THE COURTROOM DEPUTY:  They only moved 18, 19, 20,

11    35.

12             THE COURT:  You withdrew your objection to 17?

13             MR. O'NEILL:  Absolutely no, Your Honor.  It's my

14    understanding he's not admitting 17 into evidence.

14:57:42  15             MR. ALEX:  That's correct.  I'm going to withdraw

16    number 17.

17             THE COURT:  Okay.  Then Exhibits 18, 19, 20, 35 are

18    admitted.

19             (Exhibits 18, 19, 20 and 35 admitted.)

14:57:56  20    BY MR. ALEX:

21    Q    Now, it's my understanding that relatives of Marcela Baca

22    were notified.

23    A    Yes, they were.

24    Q    And apparently Gabriel Martinez, who was 15 years of age

14:58:10  25    at the time, was one of the children who came to the scene?

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:58:15  1   A   I don't know that for myself.  I didn't go over and

2   contact the kids that came to the scene.

3   Q   Did you learn through one of the other investigating

4   officers that that was the case?

14:58:25  5   A   Yes.  Detective Orsted dealt with them.

6   Q   But the area was cordoned off; is that correct?

7   A   Yes.

8   Q   How was that done?

9   A   With marked patrol vehicles, officers in the street,

14:58:38  10   vehicles in the street, and crime scene tape.

11   Q   So the place where my client and some of the other

12   relatives came could only get as far about as a bus stop, bus

13   station; is that correct?

14   A   The crime seen was set up a little beyond that.  They

14:58:57  15   contacted the officer who was doing the traffic control on

16   that side and advised them that they were possible relatives

17   of the people involved in the collision.  Because there were

18   so many of them and there were kids involved, he allowed them

19   into that portion of the scene and sat them at the bus stop

14:59:14  20   just inside the scene.

21   Q   How far was that from where the vehicles came to rest?

22   A   If you look to the east side of the intersection, which is

23   the right hand side of Van Buren going that way, you can see

24   the southern curb line is heading in southeasterly direction.

14:59:29  25   That is opening up for the bus bay right there.

DIRECT EXAMINATION – DETECTIVE MICHAEL SOLACE

14:59:32  1   Q   Okay.  So it's fairly close, then.  Could the children see

2   where the Cadillac came to rest?

3   A   I do not know.

4   Q   And at some point Gabriel was notified by the officer that

14:59:51  5   his mother didn't make it; is that correct?

6   A   That's correct.

7          MR. ALEX:  I have no further questions.

8          THE COURT:  All right.  We're at 3 o'clock, members

9   of the jury, so we're going to take a 15-minute break at this

15:00:06 10   point.  We'll resume at 3:15.  Please remember not to discuss

11   the case, and we'll excuse you at this time.

12          (The jury exited the courtroom.)

13          THE COURT:  Please be seated.

14          Counsel, as you can tell -- Mr. Alex.  As you all can

15:00:46 15   tell, when we're in front of the jury I want you to stand when

16   you're making objections or otherwise addressing the Court.

17          I didn't mention earlier, we have a one-lawyer rule,

18   which you were probably planning to use, which means the

19   lawyer who will be cross-examining the witness is the one who

15:01:01 20   objects or talks at sidebar.

21          All right.  We'll see you at 3:15.

22          MR. O'NEILL:  Thank you, Your Honor.

23          (Recess taken from 3:01 to 3:16.  Proceedings resumed

24   in open court with the jury present.)

15:18:56 25          THE COURT:  Ladies and gentlemen, I indicated when we

CROSS-EXAMINATION - DETECTIVE MICHAEL SOLACE

15:18:58  1    were talking this morning that we would be concluding 4:30

2    each day for trial, which is our plan.  Today I'd like to go

3    to 4:45 to make sure we're on schedule for the overall

4    completion of the trial.  Would that cause problems for any

15:19:12  5    member of the jury?

6           All right, we'll go ahead and go to 4:45, then,

7    today, counsel.

8           Mr. O'Neill, your cross-examination.

9           MR. O'NEILL:  Yes, Your Honor.  I'll do my best to

15:19:23 10    get us back on track; I'll be very quick.

11              C R O S S - E X A M I N A T I O N

12    BY MR. O'NEILL:

13    Q   Good afternoon, Detective, how are you?

14    A   Fine, thank you.

15:19:28 15    Q   Good, sir.  I like to take -- draw your attention, sir, to

16    page 10 of Exhibit 3, which you were referring to and reading

17    from, I believe, during your direct examination by counsel.

18           Do you have it open sir?

19    A   Yes, I do.

15:19:51 20    Q   When we ended off, when you stopped reading, do you recall

21    when counsel said "stop there"?

22    A   Yes.

23    Q   Okay.  Could you tell the jury what comes after the "stop

24    there," sir.

15:20:04 25    A   I believe I was talking about where he told me that he

CROSS-EXAMINATION – DETECTIVE MICHAEL SOLACE

15:20:07  1   didn't know if there were any vehicles to his immediate left

2   or in the left-turn lane and then he said as he entered the

3   intersection he observed the white Cadillac out of the corner

4   of his eye.

15:20:16  5   Q   And then counsel said "stop there."  I'd like you to read

6   the rest of Mr. Duenas' statements to you.

7   A   It's not on the paper, the copy I was given.

8        MR. O'NEILL:  Your Honor, this goes back -- may I

9   approach -- this goes back to the redaction issue.  This part

15:20:31 10   was redacted and Your Honor actually ruled on it and put it

11   back in but apparently the exhibit that was handed up to the

12   witness is still the redacted version.

13        THE COURT:  Mr. Alex, is that true?  Is this the

14   redacted version?

15:20:46 15        MR. ALEX:  I think it is the redacted version.  I

16   would have asked the question but I wasn't sure what the

17   Court's ruling was with respect to this portion.

18        THE COURT:  All right.  Do you have a copy that is

19   not redacted?

15:21:00 20        MR. O'NEILL:  I've got my copy.

21        MR. ALEX:  I have a copy.

22        THE COURT:  Why don't you go ahead and approach the

23   witness, give him a copy.  We'll have to --

24        MR. O'NEILL:  May I approach?

15:21:07 25        THE WITNESS:  I also brought my own copy of my

CROSS-EXAMINATION – DETECTIVE MICHAEL SOLACE

15:21:08  1  report, and it's the full thing.

2       MR. O'NEILL:  I've got it open.  This will be the

3  quickest way, I think.

4       THE COURT:  That's fine, go ahead and leave it with

15:21:16  5  him.

6       Hold on a minute.  You need to give it to him, go

7  back to the lectern so you're talking into a mike.

8       MR. O'NEILL:  Yes, sir.

9       THE COURT:  Go ahead and hand it to him, but,

15:21:23 10  counsel, we need to make sure that the Exhibit 3 that is

11  marked is corrected to match this so when goes back to the

12  jury room it's complete.

13       MR. ALEX:  That's correct.

14  BY MR. O'NEILL:

15:21:31 15  Q   Detective, I actually wrote on my copy a quote, "stop

16  there."  Do you see where I wrote that?

17  A   Yes, I do.

18  Q   If you could read the rest of Mr. Duenas' statement to you

19  that wasn't read earlier.

15:21:43 20  A   All right.  "After noticing the Cadillac out of the corner

21  of his eye, it appeared that the Cadillac was travelling fast

22  and Alfredo advised me he attempted to swerve to the right to

23  avoid the collision."

24       MR. ALEX:  Can I object, Your Honor?

15:21:59 25       THE COURT:  What's the objection?

CROSS-EXAMINATION – DETECTIVE MICHAEL SOLACE

15:22:01  1    MR. ALEX:  That's the part that we agreed to redact
2    was the very part that was read.
3    THE COURT:  Well, what was just read, in my view, is
4    relevant enough not to be redacted so I'll overrule the
15:22:12  5    objection.
6    MR. O'NEILL:  May I approach the witness, Your Honor,
7    and retrieve my document?
8    THE COURT:  Yes.
9    MR. O'NEILL:  Thank you, sir.
15:22:19  10  BY MR. O'NEILL:
11  Q   So, Detective, in fact Mr. Duenas told you he attempted to
12  swerve prior to impact?
13  A   That's correct.
14  Q   He also told you there was a vehicle in front of him that
15:22:36  15  had made a right-hand turn, correct?
16  A   Correct.
17  Q   And making a right turn on red is legal, correct?
18  A   Once you come to a complete stop, yes, it is.
19  Q   Sir, he never told you he was fatigued, did he?
15:22:50  20  A   No.
21  Q   He never told you he was tired?
22  A   No.
23  Q   He never told you he lacked adequate sleep?
24  A   No.
15:22:56  25  Q   And you said earlier, sir, but I want to reiterate, while

DIRECT EXAMINATION - DETECTIVE DAVID SCHWARTZ

15:23:00  1  you could communicate with Mr. Duenas, there was a language

2  barrier; is that fair?

3  A    Yes, there was.  Yes.

4        MR. O'NEILL:  I have no further questions, Your

15:23:13  5  Honor.

6        THE COURT:  Any redirect, Mr. Alex?

7        MR. ALEX:  No redirect.

8        THE COURT:  Okay.  Thanks, sir, you can step down.

9  You can just leave those exhibits there and Traci will take

15:23:26 10  care of them.

11                        *  *  *

12        (Other matters reported but not transcribed herein.)

13                        *  *  *

14

15:57:50 15        MR. ALEX:  The next witness is Detective Schwartz; I

16  believe he's out there.

17        THE COURTROOM DEPUTY:  If you'll please come forward.

18  Stand right here and raise your right hand, please.

19                  **DETECTIVE DAVID SCHWARTZ,**

15:59:27 20  called as a witness herein, after having been first duly sworn

21  or affirmed, was examined and testified as follows:

22              D I R E C T   E X A M I N A T I O N

23  BY MR. ALEX:

24  Q    Can you give us your name, please.

15:59:57 25  A    Yes.  My name is David Schwartz.

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

Q   What is your occupation?

A   I'm a detective with the City of Phoenix Police Department in the vehicular crimes unit.

Q   How long have you been with the City of Phoenix Police Department?

A   About 16 years.

Q   Can you tell us a little bit about your employment history?

A   Yes.  I spent the first four years in the patrol division as a patrol officer.  Then went to a traffic bureau as a motor officer where I rode for seven years a police motorcycle.  My primary responsibilities during that time was the investigation of traffic collisions and impaired driving enforcement.  And about six years ago I went to the vehicle crimes unit as a detective where I work mainly as a traffic collision reconstructionist and a drug recognition expert in the area of impaired driving enforcement related to the investigation of fatal traffic crashes.

Q   And how long have you been a detective?

A   For six years.

Q   Do you remember coming to the accident scene on April 5th, 2009 in the afternoon at 51st Avenue and Van Buren?

A   I do.

Q   Did you go to the scene?

A   I did.

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:01:21  1   Q   Approximately what time did you get to the scene if you

2   recall?

3   A   A little bit before 4 p.m.  I think about 3:57 in the

4   afternoon.

16:01:28  5   Q   All right.  And what did you do at the scene?

6   A   First thing I did was contact one of the supervisors

7   there, the patrol supervisor, and got some brief details of

8   the investigation from him.  Then my primary responsibility at

9   that time was to contact the drivers to evaluate whether or

16:01:45  10  not impairment would be an issue in this investigation.

11  Q   All right.  And in the course of doing that, did you come

12  into contact with Mr. Duenas?

13  A   I did.

14  Q   Do you have your police report with you?

16:01:58  15  A   I do.

16  Q   Could you turn to your estimate -- your supplement,

17  supplement 5, page 2.

18  A   I'm there.

19  Q   What time did you contact Mr. Duenas?

16:02:12  20  A   About 4:09 in the afternoon.

21  Q   And where was he?

22  A   He was south of where his vehicle was.  He was on the

23  southwest corner of the intersection but a little south of --

24  south of the intersection and on the west side of the roadway.

16:02:31  25  Q   And did you introduce yourself?

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:02:33  1   A   I did.

2   Q   Were you a uniformed officer?

3   A   I'm a plain clothes officer so I typically will wear a

4   badge and gun on my belt, but I'm wearing basically business

16:02:47  5   casual clothes most of the time.

6   Q   All right.  And did you tell your purpose to Mr. Duenas

7   while you were interviewing him?

8   A   I did.

9   Q   What was that?

16:02:56  10   A   I told him my primary responsibility was to determine

11   whether or not he was impaired.

12   Q   All right.  What did you do next?

13   A   We walked away from where he was waiting a little bit

14   further south just so that we could separate from anyone else

16:03:07  15   that was around us and to prevent any interruptions.

16   Q   Was he able to respond to your questions?

17   A   Yes.

18   Q   Did he respond in a normal voice?

19   A   Yes, he did.

16:03:23  20   Q   Was his -- what was his demeanor?

21   A   He was polite.  Friendly.  Cooperative.  Perhaps a little

22   nervous, as you may expect.

23   Q   Did he speak with an accent?

24   A   He did have an accent.

16:03:37  25   Q   Did he indicate what his primary language was?

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

A   Yes.

Q   And what was that?

A   We were speaking in English, but I asked about his primary language and he told me his primary language was Spanish.

Q   Did you have difficulty speaking to him in English?

A   No.

Q   Did you understand Mr. Duenas when he spoke to you?

A   Yes.

Q   Did you get the impression that he understood you when you spoke to him?

A   Throughout the majority of our contact, yes.

Q   Was that towards the end when you were giving some instructions?

A   Yes.

Q   That there was some miscommunication that you had to clarify, correct?

A   Yeah.  There was a period of time in which there seemed to be some misunderstanding on his part and I wasn't able to get him to understand what I was trying to get him to do.  But I moved on to something else.

Q   Was that when you were doing field sobriety tests?

A   Yes.

Q   Let's back up earlier.  Did you indicate in paragraph 2 that you had no difficulty understanding his English?

A   That's correct.

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:04:46  1   Q    Did he tell you about his physical condition at that time?

2   Whether he had any pain?

3   A    Yes, he did.

4   Q    What did he tell you?

16:04:53  5   A    He told me that the left side of his head hurt and he told

6   me he believed he may have struck his head on the side glass

7   of the window during the collision.  But he had no visible

8   injury just that he felt pain there.  And he told me he hadn't

9   lost any consciousness that he knew of.

16:05:12  10  Q    All right.  Did he seem focused on your questions?

11  A    Yes.

12  Q    Okay.  Could you tell us, then, the conversation you had

13  with Mr. Duenas.

14  A    Majority of my conversation had to do briefly with things

16:05:28  15  that we would typically ask someone in an impairment

16  evaluation.  I didn't necessarily ask him what happened in the

17  collision.

18       I did ask him questions about whether or not he had

19  been drinking in the last 24 hours, whether or not he had been

16:05:43  20  taking medications or drugs, and I asked him some questions

21  about his sleep habits or recent sleep history.  He told me

22  that the last time he had slept was at 12:45 in the afternoon

23  where he had woken up from a nap which he believed was about

24  one to one and a half hours long.

16:06:05  25       I tried to ask some follow-up questions since that

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:06:08   1   was kind of a midday nap and was unusual for something for me

       2   to hear.  I tried to ask questions when he slept prior to

       3   that, maybe he slept the previous evening, and he seemed to

       4   have some difficulty recalling exactly when it was he had last

16:06:24   5   slept prior to that.  So I simply just moved on to another --

       6   I didn't really press him on that issue and just moved on to

       7   the other questions in the investigation.

       8   Q    Let me back up a little bit.  Did you ask Mr. Duenas -- he

       9   said he was driving for -- he is a truck driver for UPS, do

16:06:42  10   you see that?

      11   A    Yes.

      12   Q    Could you go on from there and tell us what he told you.

      13   A    Yeah.  He told me that he was the driver and that he had a

      14   co-passenger -- a passenger that was the co-driver of the

16:06:55  15   truck in the right front seat.

      16   Q    Did he say where they started the day?

      17   A    Yes.  He said they started their day in Casa Grande

      18   Arizona and had gone to the UPS facility where they had left a

      19   trailer.  He said after leaving the trailer they realized they

16:07:11  20   had forgotten some of their paperwork that needed to be left

      21   at the UPS facility, so he said they turned around somewhere

      22   around I-10, Interstate I-10, and were proceeding back to the

      23   UPS facility to turn in the paperwork when the collision

      24   happened.

16:07:30  25   Q    Did Mr. Duenas tell you the color of the light during this

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:07:33  1  interview?

2  A   He did.

3  Q   And what did he tell you?

4  A   He said he was driving southbound approaching the

16:07:38  5  intersection and the light was green.

6  Q   At the intersection?

7  A   Yes.

8  Q   Okay.  Did he tell you that he tried to stop and couldn't

9  avoid the accident?

16:07:51 10  A   Yes.  He saw the other vehicle and said he tried to stop

11  but simply couldn't avoid colliding with her.

12  Q   All right.  Did you have a conversation about when he woke

13  up?  Is that correct?

14  A   I have to refresh my recollection.

16:08:13 15  Q   It's right after he couldn't avoid the collision.  Do you

16  see that?

17  A   Yes, that's the conversation about the sleeping.

18  Q   He said he woke up at 12:45; is that correct?

19  A   Yes.

16:08:27 20  Q   That was after sleeping one to one and a half hours?

21  A   Correct.

22  Q   And he was unable to clearly recall when he slept prior to

23  that?

24  A   Yes.

16:08:37 25  Q   Did Mr. Duenas indicate whether he had any physical

DIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:08:40   1   disabilities?

2   A   He said no.

3   Q   He indicated he had not consumed any alcohol in the last

4   24 hours?

16:08:48   5   A   That's correct.

6   Q   He said he had diabetes?

7   A   Yes.

8   Q   And what else did he tell you?

9   A   Specifically about the diabetes?

16:08:58  10   Q   Yes.

11   A   He said he --

12         MR. O'NEILL:  Objection, Your Honor.  Relevance.

13         THE COURT:  Sustained.

14         MR. ALEX:  I'm fine with that.  I'll move on.

16:09:07  15   BY MR. ALEX:

16   Q   And he told you he had been a truck driver; is that

17   correct?

18   A   Yes.

19   Q   You performed some tests; is that correct?

16:09:23  20   A   Yes.

21   Q   It was during those tests that he required some additional

22   explanation?

23   A   Yes.

24         MR. ALEX:  I have nothing further.

16:09:33  25         THE COURT:  Cross-examination.

CROSS-EXAMINATION - DETECTIVE DAVID SCHWARTZ

16:09:36  1    MR. O'NEILL:  Thank you, Your Honor.

2         C R O S S - E X A M I N A T I O N

3    BY MR. O'NEILL:

4    Q   Detective, just briefly so if my math is correct, and I

16:09:44  5    went to law school for a reason, my math is probably not

6    correct, but you actually saw and spoke with Mr. Duenas about

7    a half hour after the accident?

8    A   Give me just a second and I'll look at the times.

9    Q   My math is wrong.  It's about 90 minutes.

16:10:06  10    A   I was going to say about an hour and a half.

11    Q   Again, that's why I went to law school.

12        Okay, so you saw him about 90 minutes post accident,

13    correct?

14        Okay.  And when you spoke with him, you spoke with

16:10:14  15    him for the primary not -- not even primary, but for the sole

16    reason to determine whether or not he was under the influence

17    of either alcohol or drugs or impaired in any way.

18    A   That was my primary responsibility, yes.

19    Q   And in doing so, you spoke with him?

16:10:27  20    A   Yes.

21    Q   Interviewed him?

22    A   Yes.

23    Q   How long were you with him in interviewing him?

24    A   Probably 15 minutes.

16:10:36  25    Q   Okay.  And in that 15 minutes, you asked him how he was

CROSS-EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:10:41  1    feeling, correct?

2    A    Yes.

3    Q    And he indicated to you he was feeling fine, correct?

4    A    Other than his head hurt on the side.

16:10:48  5    Q    He said he hit his head, correct?

6    A    Yes.

7    Q    And you actually -- he stated he was nervous because of

8    the collision, but other than that he was feeling fine.

9    A    Yes.

16:10:57  10   Q    Okay.  Now, you also did some tests on Mr. Duenas,

11   correct?

12   A    I did.

13   Q    The first one you tried to do was the Rhomberg balance

14   test.

16:11:12  15          MR. ALEX:  Relevance.

16          THE COURT:  Overruled.

17   BY MR. O'NEILL:

18   Q    Was the Rhomberg balance test, correct.

19   A    Yes.

16:11:18  20   Q    Can you tell the jury what that test is for, first.

21   A    It's a field sobriety test that is typically performed in

22   impaired driving investigations at roadside.  It's a tool that

23   we use to look for signs and symptoms of impairment.

24   Q    And when you were trying to give Mr. Duenas the

16:11:35  25   instructions how to do this test, he didn't understand your

CROSS-EXAMINATION - DETECTIVE DAVID SCHWARTZ

16:11:38  1  instructions, did he?

2  A    Well, he stated that he did and when we started the test I

3  would say the results of his ability to perform the test

4  indicated to me he didn't properly understand the

16:11:56  5  instructions.  So he didn't say he didn't understand them.

6  Q    So there was miscommunication between and you Mr. Duenas.

7  A    I believe so, yes.

8  Q    In fact, it's a balance test where you stand on one foot,

9  but when you asked him to perform the test he actually opened

16:12:09  10  his eyes wide and said "okay."

11  A    No.  The test I was performing requires a person to stand

12  with their feet together, hands to their side, their head

13  tilted back slightly and eyes closed, and they're supposed to

14  estimate the passage of 30 seconds after I say the word

16:12:22  15  "start."  And I attempted to start the test twice and both

16  times as soon as I say "start" he would open his eyes and say

17  "okay."  So I believed he didn't understand fully the

18  instructions I gave him.

19  Q    Okay.  And similarly, when you attempted to give him a

16:12:40  20  breath analysis test, he didn't understand those instructions

21  initially either, correct?

22  A    Give me just a second.

23  Q    I'll direct your attention to page 3 of your supplemental

24  report.

16:12:51  25  A    Yes.

CROSS-EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:12:59 1    Q    Yes he didn't understand your instructions?

2    A    That's correct.

3    Q    And in fact you had to actually physically show him what

4    you needed him to do to take the breathalyzer test.

16:13:07 5    A    Yes.

6    Q    Again, sir, you'll agree with me you're having a

7    communication failure or breakdown with Mr. Duenas while

8    trying to describe this test.

9    A    Yes.

16:13:17 10    Q    Okay.  Now, the results of the test, so the jury's clear,

11    was 0.00.

12    A    That's correct.

13    Q    Meaning no alcohol in the system whatsoever.

14    A    That's correct.

16:13:28 15    Q    And during your questioning and during your impairment

16    analysis of him, you didn't find him fatigued either, did you?

17    A    No.

18    Q    He appeared coordinated and was able to respond to your

19    questions appropriately in a normal voice.

16:13:54 20    A    Yes.

21    Q    He was polite and cooperative with you?

22    A    He was.

23    Q    He was never evasive.

24    A    That's correct.

16:14:07 25    Q    You've been doing this a long time, sir.

CROSS-EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:14:10  1    A   Long enough, yes.

2    Q   You know when someone you're questioning is attempting to

3    be evasive.

4    A   I believe I generally have a good read on people and have

16:14:17  5    interviewed enough people to kind of tell when they're being

6    evasive, yes.

7    Q   In your professional experience, Mr. Duenas was being

8    forthright with you.

9    A   I believe so, yes.

16:14:32  10   Q   Now, did Mr. Duenas also tell you he had been in the

11   sleeper berth for approximately 10 to 12 hours prior to him

12   getting out and driving on the day of the accident?

13   A   No.

14   Q   Did you specifically ask him that, do you recall?

16:14:46  15   A   I had the specific questions about when he had last slept.

16   Q   And he told you that, he told you specifically when he

17   last slept, he just didn't give you anything beyond that.

18   A   Right.

19   Q   Did you ask him anything about his driving history?

16:15:07  20   A   For the day.  I tried to get his driving history for the

21   day about where they started and stuff, but I don't really

22   know who was driving.  He said he started in Casa Grande.

23   Q   And was where he started important for your purposes of

24   determining impairment?

16:15:25  25   A   When I'm looking at someone's sleep habits or recent sleep

CROSS-EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:15:31   1    history, it's important because oftentimes in certain

2    classifications of drug categories people will stay up for

3    long periods of time and skip sleep or they may be someone who

4    is on a classification of drugs that has them sleeping very

16:15:46   5    long periods of time.  So those are just information that's

6    helping me try to make a decision that if this person is

7    impaired what maybe classification of drug may be impairing

8    them.  That's the main purpose of me asking those questions

9    about sleep.

16:16:06  10    Q    Just so the jury's clear, Mr. Duenas wasn't on any drugs

11    at the time of the accident?

12    A    No.

13    Q    And ultimately you concluded that while he was nervous,

14    which is understandable given he was just in an accident; is

16:16:19  15    that fair?

16    A    Yes.

17    Q    When you interview people post accident, is it fair to say

18    oftentimes they're nervous?

19    A    Majority of the time I'm interviewing someone who's

16:16:28  20    exhibiting signs of nervousness.

21    Q    Especially a serious accident like this.

22    A    Yes.

23    Q    Okay.  But despite the nervousness, sir, you found he was

24    not impaired for purposes of operating the vehicle.

16:16:39  25    A    Yes.

REDIRECT EXAMINATION - DETECTIVE DAVID SCHWARTZ

16:16:41  1      MR. O'NEILL:  No further questions, Your Honor.

2      THE COURT:  Any redirect?

3      MR. O'NEILL:  Thank you.

4      MR. ALEX:  Yes, Your Honor.

11:19:09  5          R E D I R E C T   E X A M I N A T I O N

6  BY MR. ALEX:

7  Q   Detective Schwartz, you did not find he was not fatigued;

8  is that correct?  What you found was he was not impaired by

9  alcohol or drugs.

16:17:10  10  A   When I'm looking for impairment, I'm looking for signs and

11  symptoms that their physical ability or mental ability are

12  decreased in any way that can be observed.  I'm not

13  necessarily looking for the cause of that necessarily per se.

14  So if impairment was present, I should have noticed it and

16:17:33  15  observed it and documented it and taken that into

16  consideration regardless whether it was alcohol, drugs, or

17  fatigue.

18  Q   Or what?

19  A   Regardless whether it was alcohol, drugs, fatigue, or any

16:17:46  20  other factor that could cause someone to be exhibiting

21  difficulties.

22  Q   You're a drug recognition -- you're a drug or alcohol

23  impairment recognition expert, correct?

24  A   Yes.

16:18:00  25  Q   And one of the things you want to do is find out how long

REDIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:18:05  1    these people were awake; is that correct?

2    A    Yes.  As I said, because that can give an indication of

3    possibly what classification of drug is may be impairing them.

4    Q    And that's the reason why you asked Mr. Duenas where he

16:18:19  5    started that day, correct?

6              MR. O'NEILL:  Objection, leading.

7              THE WITNESS:  Yes.

8              THE COURT:  Overruled.

9    BY MR. ALEX:

16:18:26  10   Q    That's the reason why you were asking specifically how

11   much time -- how much sleep he had that day, correct?

12   A    That's correct.

13   Q    And when he slept last.

14   A    Yes.

16:18:41  15   Q    Now, is there any test that you have with the department

16   that you're aware of that measures fatigue?

17   A    The test that I perform measure impairment.  I've never

18   arrested someone for impairment and found out later it was

19   solely for fatigue.  So I don't have tests that were designed

16:19:05  20   specifically to measure fatigue.

21   Q    What I'm asking you specifically is prior to an

22   accident -- prior to the collision, you have no way of knowing

23   whether Mr. Duenas was fatigued; is that correct?

24   A    That's correct.

16:19:25  25   Q    You see him an a hour later.

REDIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:19:27   1   A   Hour and a half later, yes.

2   Q   Hour and a half later.  By that time a lot of things have

3   changed, right?  There's been a serious accident?

4           MR. O'NEILL:  Objection, leading, Your Honor.

16:19:37   5           THE COURT:  Sustained.

6   BY MR. ALEX:

7   Q   Well, the circumstances changed in that hour and a half;

8   is that correct?

9   A   I believe they're probably different than when he was

16:19:51  10   driving, yes.

11   Q   Sure.  And you have no way of knowing what his condition

12   was in terms of fatigue when he was driving.

13   A   I don't.

14           MR. O'NEILL:  Objection, leading, Your Honor.

16:20:05  15           THE COURT:  Overruled.

16           THE WITNESS:  I don't.

17   BY MR. ALEX:

18   Q   All you could do was make an assessment an hour and a half

19   later.

16:20:11  20   A   Yes.

21   Q   If you could explain, some things changed in that hour and

22   a half, haven't they?

23   A   Yes.

24   Q   Tell me some of the things that changed.

16:20:20  25   A   For one, he's not driving, he's standing on a sidewalk

REDIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:20:24  1    talking to a police detective, which is not something most

2    people typically do.  So I'm seeing signs he may be nervous

3    such as elevated pulse rate and, you know, the typical

4    response you can visually see from someone being nervous.

16:20:39  5         He's been waiting at the scene probably wondering

6    what's going to happen.  I assume he has some side idea of the

7    severity of the collision he's been involved in, which is not

8    a usual circumstance for most people.  So I could imagine his

9    state of mind was probably different than when he was driving.

16:20:59 10    But just looking at it from those perspectives, those are some

11    things I think would be changed for him.

12    Q   Would you agree with me a person who may have been

13    fatigued prior to a crash, an hour and a half later, after

14    this accident, may have more adrenaline flowing into his body

16:21:19 15    and being completely different physiologically?

16         MR. O'NEILL:  Objection, Your Honor, calls for

17    speculation.

18         THE COURT:  Overruled on that basis.

19         MR. O'NEILL:  I'd also further object this is calling

16:21:31 20    for expert testimony out of the detective at this point that

21    he has not laid a foundation for nor been identified for.

22         THE COURT:  Overruled.

23         THE WITNESS:  I forgot the question.

24    BY MR. ALEX:

16:21:43 25    Q   Oh.  Well, physiologically a person's condition may change

REDIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:21:49  1    before a crash in terms of being fatigued and what happens

2    after a crash occurs, particularly of this magnitude.

3    A    Like I testified earlier, typically when I'm interviewing

4    someone afterwards, a lot of things have changed for them and

16:22:06  5    they do exhibit those signs of nervousness.  Elevated pulse

6    rate is something I see in a lot of people I interview.  The

7    physiological state of most people are quite different at the

8    time I contact them from the time they were driving.

9    Q    And what I'm asking is you weren't able to make any

16:22:23 10    determination about what Mr. Duenas' condition was prior to

11    the accident.

12    A    That's correct.

13    Q    But what you could do is learn about how much time -- how

14    much sleep he had, how much sleep he could recall having slept

16:22:42 15    last and when he started?

16    A    Yes, I could attempt to do that, yes.

17    Q    Now, when you give the field sobriety tests, and you've

18    probably given this thousands of times?

19    A    Yes.

16:22:54 20    Q    Do the people sometimes people, even where English is

21    their first language, do they have sometimes difficulty

22    understanding the instructions?

23    A    Yes.

24    Q    So it's not that they don't understand you, they can

16:23:08 25    understand English, but they don't understand the instructions

REDIRECT EXAMINATION – DETECTIVE DAVID SCHWARTZ

16:23:10   1   you're giving them.

2   A   Vast majority of people are capable of understanding them

3   because there's nothing really difficult about the

4   instructions, they're all designed to be fairly simple.

16:23:23   5   Sometimes it's an inability to translate the instructions on

6   my part, perhaps, to them, but most often than not in the

7   thousands of times I've given them, large portion of those

8   times I'm giving them to someone who is impaired by some

9   substance that could cause them confusion.

16:23:43   10   Q   Even those people who are not impaired, because they're

11   nervous or distracted, sometimes they have to ask that you

12   repeat the instructions.

13   A   Yeah.  It's not generally a sign of impairment to ask

14   additional instructions or need additional instructions.

16:23:57   15   Q   And that's what happened to Mr. Duenas, you had to repeat

16   some of the instructions to him, correct?

17   A   Yes.

18       MR. ALEX:  Nothing further.

19       THE COURT:  All right.  Thank you.  You can step

16:24:07   20   down.

21       THE WITNESS:  Thank you, Your Honor.

22       (End of partial transcript.)

23           * * * * *

24

25

1                          **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true, and accurate transcript of all of that portion

9     of the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control, and to the best

12    of my ability.

13

14             DATED at Phoenix, Arizona, this 16th day of January,

15    2013.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25